**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

JASON M. FARR,

Plaintiff,

v. Case No. 21-CV-469

JEREMY BOUSMAN,

Defendant.

---

**DEFENDANT JEREMY BOUSMAN'S BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

Defendant Jeremy Bousman ("Officer Bousman"), by and through his attorneys, Crivello Carlson, S.C., respectfully submits the following Brief in Support of his Motion for Summary Judgment. As a matter of law, Plaintiff Jason M. Farr ("Farr") cannot establish his Fourth and Fourteenth Amendment claim of excessive force against Officer Bousman. Officer Bousman's use of force was objectively reasonable in response to the perceived threat created by the continuing and escalating resistance exhibited by Farr during his arrest on January 22, 2021, which included Farr spitting in Officer Bousman's face. Officer Bousman used only the minimal amount of force necessary to prevent Farr from further spitting on him or other responding law enforcement officers. Further, Officer Bousman is entitled to qualified immunity as to Farr's claim of excessive force against him. Because the undisputed, material facts establish that Farr's claim fails as a matter of law, Officer Bousman respectfully requests that the Court grant his Motion for Summary Judgment.

## FACTS

On January 22, 2021, at approximately 12:51 p.m., an on-duty City of Waukesha police officer, Darin Wittnebel ("Officer Wittnebel"), was operating his patrol vehicle on East Main Street, Waukesha, Wisconsin, when he observed a vehicle containing three occupants pass his location. (Defendant's Proposed Findings of Material Facts ("DPFOF") ¶ 2). The vehicle did not have any license plates displayed. (*Id.*) Officer Wittnebel activated the emergency lights on his patrol vehicle to conduct a traffic stop of the vehicle. (*Id.* ¶ 3). The operator of the vehicle that was the subject of the traffic stop initially applied the brakes, but instead of pulling to the side of the road, he continued traveling eastbound on East Main Street as it merged onto East Moreland Boulevard. (*Id.* ¶ 4). As Officer Wittnebel was in pursuit of the vehicle, he saw the passenger in the front seat leaning over the center console, and he observed her reaching down towards the floorboard of the vehicle to such an extent that Officer Wittnebel momentarily lost sight of the passenger through the vehicle's windows. (*Id.* ¶ 5).

On January 22, 2021, Officer Bousman was also on duty in his capacity as a patrol officer for the City of Waukesha Police Department. (*Id.* ¶ 1). Officer Bousman heard Officer Wittnebel report over the police radio that he attempted to initiate a traffic stop, but the vehicle was "slow to stop" and the subjects inside the vehicle were making "furtive movements." (*Id.* ¶ 6). Officer Bousman responded to Police Dispatch via his radio, indicating that he would provide assistance to Officer Wittnebel. (*Id.* ¶ 7). Officer Bousman then began driving towards Officer Wittnebel's location to assist with the traffic stop. (*Id.*)

The vehicle eventually pulled over and came to a stop on East Moreland Boulevard, near Springdale Road, in Waukesha, Wisconsin. (*Id.* ¶ 8). Farr was identified as the driver of the vehicle. (*Id.* ¶ 9). Shortly after the vehicle pulled over and came to a stop, Officer Bousman arrived on the scene and approached the vehicle from the driver's side to assist Officer Wittnebel, who was

speaking to the occupants through the front passenger window. (*Id.* ¶ 10). As Officer Bousman approached the open driver's window of the vehicle, he detected the scent of fresh marijuana emanating from the interior of the vehicle. (*Id.* ¶ 11). Officer Wittnebel and Officer Bousman observed two clear, plastic bags containing a green leafy substance in the center console of the vehicle. (*Id.* ¶ 12). Farr informed the officers that the bags contained marijuana and belonged to him. (*Id.* ¶ 13). During the officers' investigation, the Waukesha Police Dispatch advised them that Farr had an outstanding felony warrant through the Milwaukee County Sheriff's Department for operating a vehicle without the owner's consent. (*Id.* ¶ 14). Based on Farr's admitted possession of THC and the outstanding felony warrant, Officer Bousman determined that probable cause existed to take Farr into custody. (*Id.*)

As the officers were questioning the occupants of the vehicle, Officer Bousman observed Farr rolling up the driver's side window. (*Id.* ¶ 15). Officer Bousman ordered Farr to keep his window rolled down, and he informed Farr that he was not free to leave. (*Id.*) In response, Farr verbally protested and did not comply with Officer Bousman's order for him to keep his window rolled down. (*Id.* ¶ 16). Officer Bousman then ordered Farr to turn off the vehicle and give the keys to him. (*Id.* ¶ 17). However, Farr continued to verbally protest Officer Bousman's orders, and Farr still had not rolled down his window, nor did he initially turn off the vehicle or hand the keys to the vehicle to Officer Bousman. (*Id.* ¶ 18).

In response to Farr's noncompliance, Officer Bousman began raising his voice and using stronger control talk in attempt to gain compliance from Farr. (*Id.* ¶ 19). Officer Wittnebel also began giving verbal instructions from the passenger side of the vehicle for Farr to comply with Officer Bousman's directions. (*Id.*) Because Farr continued to ignore the officers' orders to leave the window rolled down and turn off the vehicle, Officer Bousman opened the driver's door to the vehicle and again instructed Farr to turn off the vehicle. (*Id.* ¶ 20). Upon opening the door to the

vehicle, Officer Bousman detected the smell of alcohol emanating from the interior of the vehicle. (*Id.* ¶ 21). Officer Bousman also observed that Farr's eyes were bloodshot, his eyelids sagged, and his speech was slurred, leading Officer Bousman to believe that Farr was likely under the influence of drugs and/or alcohol. (*Id.* ¶ 22).

Officer Bousman then observed Farr beginning to reach inside of his pockets. (*Id.* ¶ 23). Fearing that he may be attempting to access a weapon, Officer Bousman ordered Farr to keep his hands out of his pockets. (*Id.*) Farr did not initially comply with Officer Bousman's orders to keep his hands out of his pockets, but instead protested stating that he was cold. (*Id.* ¶ 24). Officer Bousman then observed Farr beginning to fidget with the center console in the vehicle and underneath his seat. (*Id.* ¶ 25). Fearing that Farr might have been trying to access a weapon, Officer Bousman again instructed Farr stop moving within the vehicle. (*Id.* ¶ 26). However, Farr did not fully comply with Officer Bousman's orders and continued to fidget within the vehicle. (*Id.* ¶ 27).

Next, Officer Bousman verbally directed Farr to step out of the vehicle. (*Id.* ¶ 28). Eventually, Farr turned off the vehicle, handed the keys to Officer Bousman, and exited the vehicle. (*Id.* ¶ 29). Officer Bousman escorted Farr to the front of one of the patrol vehicles to conduct a body search of Farr. (*Id.* ¶ 30). As Officer Bousman began to search Farr's right side, Officer Wittnebel and Officer Bousman observed Farr drop his left arm down towards the waistband of his coat pocket. (*Id.* ¶ 31). Fearing that Farr was attempting to access a weapon, Officer Wittnebel instructed Farr to quit reaching and began to draw his duty weapon. (*Id.* ¶ 32). Officer Bousman also ordered Farr to stop reaching out of concerns that Farr may have been attempting to access a weapon or destroy or dispose of contraband. (*Id.* ¶ 33). Farr verbally protested Officer Bousman's orders to stop reaching during the search by stating that he was not reaching. (*Id.* ¶ 34). Officer Bousman again told Farr to stop reaching, reiterating the seriousness of the situation and that Farr needed to follow his instructions. (*Id.* ¶ 35). However, throughout the body search, Farr continued

moving, and Officer Bousman again ordered him to stop moving. (*Id.* ¶ 36). Officer Bousman handcuffed Farr, and after completing the body search, Officer Bousman placed Farr into the backseat of his patrol vehicle and secured the seatbelt on him. (*Id.* ¶ 37).

Officer Wittnebel removed the other occupants from the vehicle, and Officer Bousman and Officer Wittnebel performed a search of the vehicle Farr had been driving. (*Id.* ¶ 38). Numerous items of contraband and paraphernalia were discovered within the vehicle, including a shaved metal piece commonly used as a filter to a crack pipe; a metal rod containing brown and black burn marks resembling a push stick device that is commonly used to place narcotics in and clean narcotics out of crack pipes; a small electronic scale; multiple credit/debit cards bearing the names of individuals other than Farr or the other passengers; and a 200 milliliter bottle of Jose Cuervo gold tequila with a broken seal and approximately one inch of liquid remaining in the bottle. (*Id.* ¶ 39).

Following the vehicle search, Officer Bousman returned to his patrol vehicle to enter information into the vehicle's computer system, while simultaneously monitoring Farr, who was located in the back of the patrol vehicle. (*Id.* ¶ 40). Officer Bousman observed that Farr had slumped down in his seat in the back of the patrol vehicle and removed his seatbelt. (*Id.* ¶ 41). Officer Bousman opened the rear passenger door of the patrol vehicle, informed Farr that he needed to keep his seatbelt on, readjusted and secured the seatbelt on Farr, and closed the door to return to the front seat. (*Id.* ¶ 42). Farr responded to Officer Bousman by repeatedly stating that he was being harassed. (*Id.* ¶ 43).

After Officer Bousman closed the back door of the patrol vehicle, he observed Farr slump in his seat, place his feet onto the plexiglass partition that divides the rear prisoner compartment from the front driver and passenger seats of the patrol vehicle, and use his feet to push and kick against the plexiglass. (*Id.* ¶ 44). Officer Bousman again opened the rear passenger door and instructed Farr to take his feet off the plexiglass divide. (*Id.* ¶ 45). Farr responded by repeatedly

yelling "I'm being harassed," and instead of complying with Officer Bousman's orders, Farr placed his feet against the open door and the cage in the prisoner compartment, preventing Officer Bousman from closing the door. (*Id.* ¶ 46). Officer Bousman ordered Farr to put his feet into the vehicle, but Farr did not comply and continued repeating that he was being harassed. (*Id.* ¶ 47).

Due to Farr's resistive behavior and continued noncompliance, Officer Bousman used his police radio and requested a transport van and restraint chair to be delivered to the scene to safely transport Farr. (*Id.* ¶ 48). Officer Bousman informed Farr that a restraint chair was being delivered to the scene to transport him. (*Id.* ¶ 49). In response, Farr inquired as to the whereabouts of his coat, stating to Officer Bousman that his coat cost more than the car. (*Id.*)

Farr then directed numerous insults and racial slurs to Officer Bousman. (*Id.* ¶ 50). He proceeded to verbally threaten Officer Bousman with physical violence by stating, "I'd knock your noodle out, if I had a chance," and "If you was ever in the ghetto, I'd fuck you up, on the g. I'd rob your ass, rape your ass, take your ass, all your cash, everything. If I caught you by the ATM, I'd hit you in the head with some shit and take your motherfucking money." (*Id.*) Given Farr's aggressive and erratic behavior, Officer Bousman stated that he was worried about Farr and asked him whether "he had taken drugs." (*Id.* ¶ 51). Farr responded that he had not taken drugs, and then continued yelling repeatedly that he was being harassed. (*Id.* ¶ 52). In an effort to deescalate the situation, Officer Bousman continued to monitor Farr from outside of the patrol vehicle, with minimal engagement, while he waited for the transport van and restraint chair to arrive on the scene. (*Id.* ¶ 53).

Farr then asked another officer who was standing near Officer Bousman to retrieve his coat from his vehicle before the vehicle was towed. (*Id.* ¶ 54). In response, the officer stated that he needed to continue monitoring Farr to ensure that he remained under control due to the behavior he had displayed towards the officers. (*Id.* ¶ 55). Officer Bousman heard Farr state in reply, "Okay.

I'll get under control if you go get my coat." (*Id.* ¶ 56). Officer Bousman perceived this as a threat of further noncompliance by Farr. (*Id.* ¶ 57).

Farr then continued to direct disrespectful statements and vulgarities towards Officer Bousman. (*Id.* ¶ 58). He also made additional verbal threats of physical violence towards Officer Bousman, stating "Your life ain't shit to me. I'll snuff it out at any moment, bitch." (*Id.*) With the intention of not further escalating the situation, Officer Bousman did not respond to Farr's threats or otherwise engage him. (*Id.* ¶ 59). However, after threatening to kill Officer Bousman, Farr said, "Fuck you," leaned forward, and spit directly in Officer Bousman's face. (*Id.* ¶ 60). Immediately thereafter—and in consideration of Farr's resistive and noncompliant behavior to that point—Officer Bousman believed that Farr would attempt to spit on him and/or other officers again. (*Id.* ¶ 61).

Therefore, after Farr's spit contacted Officer Bousman's face, Officer Bousman used his open left hand to turn Farr's head to prevent him from further spitting on Officer Bousman or other officers. (*Id.* ¶ 62). Once Farr's head had been successfully turned by Officer Bousman's open left hand, Officer Bousman used his left forearm and open right hand to stabilize Farr's head and shoulders against the plexiglass partition in back seat of the patrol vehicle to prevent him from further spitting on Officer Bousman or other officers. (*Id.* ¶ 63). Farr continued to resist by making jerking movements as Officer Bousman continued his efforts to stabilize Farr. (*Id.* ¶ 64). Officer Bousman only used as much force as was necessary to secure Farr's head in place against the plexiglass so that Farr could not spit on Officer Bousman again. (*Id.* ¶ 65).

As Officer Bousman was stabilizing Farr's head and shoulders, Officer Bousman verbally requested that a spit mask be provided by other responding law enforcement officers so that it could be placed over Farr's head to safely prevent him from further spitting on Officer Bousman or other officers. (*Id.* ¶ 66). As Farr became more stabilized, Officer Bousman removed his open right hand

from Farr's forehead and placed it on his chest. (*Id.* ¶ 67). Officer Bousman continued to use his left forearm and left open hand to secure Farr's head against the plexiglass divide to prevent him from being able to spit on Officer Bousman while he waited for another officer to arrive with a spit mask. (*Id.*)

In less than one minute from Officer Bousman's request for a spit mask, another responding officer approached Farr and placed a spit mask over his head. (*Id.* ¶ 68). Officer Bousman removed his open left hand from the side of Farr's head and placed both of his open hands onto Farr's torso region to safely stabilize him while the other officer applied the spit mask. (*Id.* ¶ 69). Officer Bousman only used as much force as was necessary to stabilize Farr so that the other officer could place the spit mask over Farr's head. (*Id.* ¶ 70). As soon as the spit mask had been successfully applied, Officer Bousman removed his hands from Farr's torso region and stepped away from the squad vehicle so that other responding law enforcement officers could continue to monitor Farr. (*Id.* ¶ 71).

Officer Bousman did not punch or otherwise hit Farr with a closed fist or the back of his hand at any time. (*Id.* ¶ 72). During the course of and/or as a result of Officer Bousman's use of force, Farr was not prevented from breathing, and he did not suffer any serious physical injury. (*Id.* ¶ 73). As a result of the incidents leading up to Farr's arrest on January 22, 2021, Farr was charged with one count of each of the following criminal offenses: 1) Non-registration of an automobile under Wis. Stat. § 341.01(1); 2) Operating a motor vehicle without insurance under Wis. Stat. § 344.62(1); 3) Operating a motor vehicle while intoxicated under Wis. Stat. § 346.63(1)(a); 4) Battery/Threat to an officer of the court or law enforcement officer under Wis. Stat. § 940.203(2); 5) Throw/Discharging bodily fluids on a public safety worker or prosecutor under Wis. Stat. § 941.375(2); 6) Felony bail jumping under Wis. Stat. § 946.49(1)(b); and 7) Possession of THC under Wis. Stat. § 961.41(3g)(e). (*Id.* ¶ 74).

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

Officer Bousman seeks dismissal of Farr's claims pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate the specific facts showing that there is a genuine issue for trial. *Id.* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. Nor will speculation, hearsay, or conclusory allegations suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Mills v. First Federal Savings & Loan*, 83 F.3d 833, 840 (7th Cir. 1996).

Further, "[w]hen the non-movant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict." *Lawrence v. Kenosha County*, 304 F. Supp. 2d 1083, 1087 (E.D. Wis. 2004) (citing *Anderson*, 477 U.S. at 267; 106 S.Ct. 2505). When faced with a summary judgment motion, courts must decide whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair

chance of obtaining a verdict. If not, the motion must be granted, and the case dismissed. *Palucki v. Sears Roebuck & Co.*, 879 F.2d 1568, 1572-73 (7th Cir. 1989).

In this case, Farr cannot present proof which would, as a matter of law, impose liability on Officer Bousman. The failure of proof on the essential elements Farr's claims against Officer Bousman makes all other facts immaterial. *See Celotex*, 477 U.S. at 323. Accordingly, the Court should grant Officer Bousman's Motion for Summary Judgment.

## II. OFFICER BOUSMAN'S USE OF FORCE WAS OBJECTIVELY REASONABLE AS A MATTER OF LAW

"Excessive force claims are reviewed under the Fourth Amendment's objective reasonableness standard." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). Whether the force was reasonable should be "analyzed from the perspective of a reasonable officer under the circumstances." *Id.* With respect to the objective reasonableness standard applied to excessive force claims, the United States Supreme Court explained:

> A court (judge or jury) cannot apply this standard mechanically. Rather, objective reasonableness turns on the "facts and circumstances of each particular case." A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.

*Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015) (internal citations omitted). Likewise, the Court's analysis under the objective reasonableness is to be undertaken without regard to the underlying motive or intent of the officer. *See Brach v. City of Wausau*, 617 F.Supp.2d 796 (W.D. Wis. 2009). Courts consider several factors to determine whether an officer's actions were reasonable, including but not limited to, the severity of the crime for which the person is being arrested; whether the arrestee posed an immediate threat to the officer or others; whether the arrestee was resisting arrest; whether the arrestee was armed; the relationship between the need for the use of force and the amount of force used; efforts made by the officer to temper or

limit the force; any threat reasonably perceived by the officer at the time force was used; and the extent of the arrestee's injuries caused by the application of force. *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *see also Dawson*, 803 F.3d at 833.

Law enforcement officers may use "significant force to subdue someone who is actively resisting lawful detention." *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020). Regardless of how Farr might try to characterize or justify his actions, the undisputed facts and the videos, in particular, demonstrate that the amount of force used by Officer Bousman throughout the duration of the incident was objectively reasonable. Even prior to arriving on the scene, Officer Bousman was aware that Farr had been "slow to stop" after Officer Wittnebel activated his emergency lights to conduct a traffic stop of the vehicle Farr was driving. From the moment that Officer Bousman arrived on the scene, Farr repeatedly and consistently engaged in resistive and noncompliant behavior. For example, when Officer Bousman first approached Farr while he was still in his vehicle, Farr disobeyed Officer Bousman's verbal orders for him keep his window rolled down. Further, Farr failed to initially comply with Officer Bousman's orders to shut off his vehicle and turn over his keys.

After Officer Bousman raising his voice and using stronger control talk to gain Farr's compliance proved unsuccessful, Officer Bousman opened the driver's door to the vehicle to increase his presence. However, Officer Bousman's presence did not deter Farr's uncooperative behavior. Farr continued to disregard Officer Bousman's orders for Farr to keep his hands out of pockets and to stop moving within the vehicle. Moreover, when Officer Bousman removed Farr from his vehicle to search him, Farr continued to disobey Officer Bousman and Officer Wittnebel's verbal commands that Farr stop reaching into his pockets and moving during the search.

Farr's noncompliance and resistive behavior persisted and escalated after he was placed in the back of Officer Bousman's patrol vehicle. There, Farr removed the seatbelt that Officer

Bousman had previously secured on him. After Officer Bousman refastened Farr's seatbelt, Farr then used his feet to push against the plexiglass partition and was uncooperative when Officer Bousman ordered him to stop. When Officer Bousman opened the back door of his patrol vehicle, Farr placed his foot against the door, preventing Officer Bousman from being able to close the door. Officer Bousman verbally commanded Farr to put his feet into the vehicle, but Farr did not comply.

Acknowledging that he had not been cooperating with the officers, Farr attempted to condition his future compliance by stating that he would "get under control" if the officers brought him his coat. Officer Bousman reasonably perceived this as a threat of further noncompliance by Farr. This threat was reinforced when Farr made numerous threats of physical violence towards Officer Bousman, including the following statement, "Your life ain't shit to me. I'll snuff it out at any moment, bitch." The longer Farr refused to cooperate, the more reasonable it became for Officer Bousman to perceive a threat. *See Estate of Phillips v. Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997).

Farr's threats to physically attack Officer Bousman materialized when Farr intentionally spit directly in Officer Bousman's face. Law enforcement officers are entitled to take reasonable steps to protect themselves and others from the danger posed by an individual's attempt to spit on them. *Norwood v. Bergh*, 2019 WL 136689, *5 (E.D. Wis., Jan. 8, 2019). As the District Court for the United States Eastern District of Wisconsin has aptly noted, "[s]pitting on [law enforcement] officers and staff is not simply a way of showing disrespect. Bodily fluids like spit can carry germs and viruses that cause serious, even fatal diseases." *Id.* As such, Officer Bousman had legitimate, nonpunitive purposes for taking steps to prevent Farr from further discharging his bodily fluid on the responding law enforcement officers—in particular, maintaining security and control over Farr and protecting himself other responding law enforcement officers.

The actions undertaken by Officer Bousman in response to being spit on by Farr were rationally related to the above-noted legitimate, nonpunitive purposes, and they were not excessive in relation to those purposes. *See Kingsley*, 576 U.S. at 397-98 (citing *Bell v. Wolfish,* 441 U.S. 520, 561, 99 S. Ct. 1861, 1885, 60 L. Ed. 2d 447 (1979)). In this regard, Officer Bousman reasonably determined that using weaponless, open-handed physical means—opposed to continued verbal commands—to gain Farr's compliance and to stabilize him was necessary to prevent him from further spitting on him and/or the other officer because of Farr's consistent noncompliance with the officers' verbal orders to that point. *See Estate of Phillips*, 123 F.3d at 593 (explaining that the amount of force that is justified increases as the confrontation escalates). "Authorities must be allowed 'to graduate their response to the demands of any particular situation.'" *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) (quoting *U.S. v. Place*, 462 U.S. 696, 709 n. 10 (1983)).

Moreover, Officer Bousman consciously used only the minimal force necessary to gain control of Farr and stabilize his head in a direction that would physically prevent him from further spitting on Officer Bousman or other officers until a spit mask could be safely applied. In this regard, as Farr became more stabilized, Officer Bousman reduced the level of force being applied by removing his open right hand from Farr's forehead and placing it on his chest. Additionally, as soon as the threat of Farr spitting on the officers had been sufficiently abated by the application of the spit mask, Officer Bousman removed his hands from Farr's chest and disengaged completely. Officer Bousman also never punched or hit Farr at any time during the incident. The reasonableness of the method and degree of force used by Officer Bousman is further supported by the fact that (1) there is no indication that Farr was prevented from or was having difficulty breathing during the incident; and (2) there is no evidence that Farr suffered from lacerations, a loss of consciousness, or other serious physical injury because of Officer Bousman's use of force. *See*

*Kingsley*, 576 U.S. at 397 (the extent of the plaintiff's injury is a factor considered by courts when analyzing an excessive force claim under the objective reasonableness standard).

The level of physical force applied by Officer Bousman was reasonable and commensurate with the severity of the felony crimes of battery or threatening battery to a law enforcement officer and discharging a bodily fluid on a public safety worker[1] charged against Farr, as well as the threat perceived by Officer Bousman based on the information known to him. (*See* DPFOF ¶ 74). In light of the facts and under the circumstances confronting Officer Bousman on the afternoon of January 22, 2021, without regard to his underlying motive or intent, and without the benefit of hindsight, Officer Bousman's use of force was objectively reasonable as a matter of law. Accordingly, Farr's excessive force claim should be dismissed, and summary judgment should be entered in favor of Officer Bousman.

## III. OFFICER BOUSMAN IS ENTITLED TO QUALIFIED IMMUNITY

Even assuming *arguendo* that the Court is unable to conclude that Officer Bousman did not violate Plaintiff's constitutional rights as a matter of law, summary judgment in favor of Officer Bousman is still appropriate. Officer Bousman is entitled to qualified immunity with respect to Farr's claim because, under the existing circumstances, his conduct did not violate any clearly established law or rights belonging to Farr.

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). A prior case exactly on point is not necessarily required. *See, e.g., Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). However, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in

[1] Committing battery or threatening battery to a law enforcement officer is a felony under Wis. Stat. § 940.203(2). Throwing/discharging bodily fluid at a public safety worker or prosecutor is a felony under Wis. Stat. § 941.375(2).

[his] shoes would have understood that he was violating it.'" *Sheehan*, 135 S. Ct. at 1774. In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Sheehan*, 135 S. Ct. at 1774 (quoting *Ashcroft*, 563 U.S. at 743).

The plaintiff always bears the burden of establishing the existence of a clearly established Constitutional right violated by the public official. *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015); *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996). "When reasonable minds could differ, in the typical summary judgment decision the balance tips in favor of the nonmovant while in the qualified immunity context the balance favors the movant." *Ellis v. Wynalda*, 999 F.2d 243, 246 n.2 (7th Cir. 1993). Even if the contours of the federal right in question are found to have been clearly delineated at the relevant time, a public official may still enjoy qualified immunity if it was objectively reasonable for him to believe that his actions did not violate the federal right. In fact, public officials are shielded from suit where officials "of reasonable competence could disagree" that such acts were objectively reasonable. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In other words, "if officers of reasonable competence could disagree . . . immunity should be recognized." *Id.*

Here, Officer Bousman is entitled to qualified immunity because, as established above, there was no underlying constitutional deprivation. His use of force was an objectively reasonable and appropriate response to Farr's conduct. Qualified immunity is also warranted because Farr cannot demonstrate with the requisite level of specificity a clearly established right at the time of the alleged deprivation. In particular, Farr cannot show that his Fourth Amendment right was clearly established in this case where he actively resisted throughout the entire encounter, disregarded countless verbal commands, threatened physical violence against Officer Bousman and other law

enforcement officers, and spit in Officer Bousman's face. Nor can he cite to "a robust consensus of cases of persuasive authority" that have recognized otherwise. *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014). Accordingly, Officer Bousman's Motion for Summary Judgment must be granted and Farr's claims dismissed.

## CONCLUSION

Based upon the foregoing arguments and authorities, it is respectfully requested that this Court grant Officer Bousman's Motion for Summary Judgment and dismiss Farr's claim on the merits and in its entirety, together with the costs and disbursements of this action.

Dated this 2nd day of June, 2022.

CRIVELLO CARLSON, S.C.
Attorneys for Defendant

By: *s/ Zachary J. Flood*
SAMUEL C. HALL, JR
State Bar No: 1045476
ZACHARY J. FLOOD
State Bar No: 1099136
710 N. Plankinton Avenue, Suite 500
Milwaukee, WI 53203
Phone: (414) 271-7722
Fax: (414) 271-4438
Email: shall@crivellocarlson.com
zflood@crivellocarlson.com